**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL HOLLIDAY,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 19-CV-4564** |
| | : | |
| **PRIME CARE MEDICAL,** *et al.*, | : | |
| **Defendants.** | : | |

**MEMORANDUM**

**RUFE, J.**                                                                   **JANUARY  25, 2021**

Plaintiff Michael Holliday, proceeding *pro se*, has filed an Amended Complaint (ECF

No. 16). For the following reasons, the Amended Complaint will be dismissed in part pursuant to

28 U.S.C. § 1915(e)(2)(B)(ii), and Holliday will be permitted to proceed on certain claims as set

forth below.

**I.      FACTUAL ALLEGATIONS[1] AND PROCEDURAL HISTORY**

Holliday, an inmate currently incarcerated at the Berks County Jail ("BCJ"), brings this

civil rights action pursuant to 42 U.S.C. § 1983 for alleged violations of his constitutional rights

based on the conditions of his confinement during his incarceration from approximately June

2019 through November 2019.[2]  Holliday names the following Defendants in this action: (1)

PrimeCare Medical; (2) the Berks County Jail System; (3) Dr. Kenneth Wloczewski, a doctor

---

[1]  The facts set forth in this Memorandum are taken from Holliday's Amended Complaint and all the
documents and exhibits attached thereto.

[2]  At the time the Amended Complaint was initially submitted to the Court, Holliday was incarcerated
at BCJ.  However, it seems that he was released sometime in December of 2019.  (*See* Notice of
Change of Address, ECF No. 17 at 1.)  Subsequently, though, it appears that Holliday was
reincarcerated at BCJ as of approximately March 13, 2020.  (*See* Motion for Change of Address and
Status Update, ECF No. 18 at 1.)  The Court understands the allegations of the Amended Complaint
to relate only to the prior period of his incarceration predating his December 2019 release and not to
his subsequent reincarceration in March of 2020.

with PrimeCare Medical at BCJ; (4) Warden Janine Quigley; (5) Deputy Warden Smith; (6) Sergeant Acker (or Ackers), Disciplinary Hearing Officer; (7) Sergeant Tassone, Kitchen Supervisor; (8) Jesse Kirsh, physician's assistant with PrimeCare Medical at BCJ; (9) Gabriel Pelaez, physician's assistant with PrimeCare Medical at BCJ; (10) Nurse Leona, nurse with PrimeCare Medical at BCJ; (11) Officer Katkowski, Corrections Officer at BCJ; (12) Officer Almquist, Corrections Officer; and (13) Berks County Probation and Parole.  (ECF No. 16 at 2-6.)

Before detailing the allegations of the Amended Complaint, the Court will briefly recount the procedural history of this case.  Initially, Holliday submitted the original Complaint (ECF No. 1), but failed to pay the required filing fee or seek leave to proceed *in forma pauperis*.  The Court subsequently directed Holliday to either pay the $400 filing fee or file a motion to proceed *in forma pauperis* in order to proceed with this matter.  (ECF No. 3 at 1.)  Subsequently, Holliday filed two Motions for Leave to Proceed *In Forma Pauperis* (ECF Nos. 4, 12) as well as a Motion Requesting Additional Time to File *In Forma Pauperis* (ECF No. 6).  Before the Court had an opportunity to rule on Holliday's Motions for Leave to Proceed *In Forma Pauperis* and screen the original Complaint pursuant to § 1915, Holliday filed four separate motions (ECF Nos. 7, 9, 10, 13) seeking to add additional facts to his original Complaint.  He also sought to submit additional evidence regarding his original Complaint (ECF No. 8) and filed a series of Exhibits (ECF No. 11) which included Inmate Communication Forms, Inmate Grievance Forms, Misconduct Citations, and a Disciplinary Hearing Appeal.  As a result of Holliday's piecemeal attempt to amend the original Complaint, the Court granted Holliday leave to proceed *in forma pauperis* and ordered Holliday to file an amended complaint in this matter so that he could include all the relevant facts and allegations pertinent to his claims in a single, comprehensive

document so that the Court could properly screen his claims. Holliday's Amended Complaint (ECF No. 16) is now before the Court for purposes of conducting the required screening under 28 U.S.C. § 1915.

It appears from the Court's careful review of the Amended Complaint and all the attached documents, that nearly all of the factual allegations Holliday sets forth relate to one of six primary issues Holliday has allegedly encountered with respect to his medical and dietary needs, and his attempts to seek medical treatment at BCJ. These include: (1) difficulties obtaining the medication, metoprolol, which Holliday alleges is required for a heart condition he has, known as tachycardia; (2) inability to obtain catheters required for him to urinate due to a bladder condition; (3) allegations of intimidation and retaliation by medical personnel for seeking further medical treatment and filing grievances; (4) lack of treatment for a foot and ankle injury; (5) failure to diagnose and treat ongoing symptoms Holliday encountered following receipt of incorrect doses of methadone; and (6) failure to consistently receive gluten-free meals. As a result of these six primary concerns, which the Court sets forth in more detail below, Holliday seeks $750,000 in damages, and requests that he receive specific medical treatment including receiving metoprolol for his tachycardia, an x-ray for his foot injury, a CAT scan or MRI related to the overdose of methadone, treatment for anxiety and PTSD resulting from these incidents, and to receive a gluten free diet without mistakes. (*Id.* at 9.)

A. **Inability to Receive Prescribed Medication for Tachycardia**

Holliday alleges that at the time of his incarceration at BCJ on or about June 21, 2019, he spoke with a nurse "who worked in the medical department admitting new inmates." (ECF No. 16 at 10.) Holliday asserts that he explained to the nurse that he has a heart condition known as tachycardia, and that he has been "prescribed metoprolol for this condition." (*Id.*) It appears that

Holliday submitted several "sick calls" regarding his need for metoprolol, but by July 3, 2019, all of his "sick calls" on this issue "had been ignored[.]"  (*Id.*)  Holliday further alleges that on or about July 12, 2019, he was "brought down to medical" to speak with Defendant Pelaez, a physician's assistant, and that he "notified [Pelaez] that [he] was supposed to be taking metoprolol for" his tachycardia.  (*Id.* at 12.)  During this conversation, Holliday alleges that another physician's assistant, Defendant Kirsh "continuously interrupted" Holliday with inappropriate comments such that Holliday was unable to complete his conversation with Defendant Pelaez regarding his medical concerns and "an argument ensued."  (*Id.*; *see also id.* at 35.)  Holliday contends that he signed a release of records as instructed by Defendant Pelaez in order to release his records from his personal doctor in Reading, but that "they apparently did not send [it] out" because he has "still not gotten" his tachycardia medication.  (*Id.*)

### B.    Inability to Obtain Catheters Prescribed for Bladder Condition

Holliday similarly alleges that he also informed the admitting nurse on or about June 21, 2019 that he has "difficulty urinating" at times, particularly when he is asked to comply with a "drug urine analysis test[.]"  (*Id.* at 10.)  As a result of these circumstances, Holliday contends that his private doctor in Reading previously prescribed the use of "French 14 catheters" to aid him with respect to his urination issues.  (*Id.*)  Despite informing the nurse of his need for catheters, Holliday claims he was not provided with the necessary catheters which resulted in him being "found guilty for 'failure to provide a urine specimen'" on approximately June 25, 2019.  (*Id.*)  Holliday asserts that this failure to provide a urine specimen resulted in him receiving "15 days in disciplinary" where he was placed in "cell 109 and subjected to what inmates call 'make it rain'" – a process that involves "inmates on the top tier" of BCJ urinating down on a pole that is loose in the corner of a cell, causing the urine to seep down to the lower

4

ceiling. (*Id.*) Upon complaining to prison officials, Holliday alleges that Defendant Acker told Holliday "That's all just part of the experience[.]" (*Id.*) Holliday claims that he continued to inform unspecified prison officials about his "bladder condition" and his need for catheters, but he was still not "supplied with any catheters" and was "still punished for not being able to urinate due to this medical condition."[3] (*Id.*)

### C.  Retaliation for Seeking Medical Care & Filing Grievances for Medical Care

Holliday alleges that as he continued to seek medical treatment by requesting sick calls and filing grievances related to the medical care provided at BCJ, Defendants Wloczewski and Pelaez sought to address this issue and dissuade Holliday from seeking additional treatment and filing additional grievances. (*Id.* at 12.) Specifically, Holliday claims that on approximately August 21, 2019, he was "called down to medical to speak with [Defendant] Dr. Kenneth Wloczewski[.]" (*Id.*) While Holliday "attempted to explain [his] medical concerns" to Defendant Wloczewski, Holliday claims that he was "abruptly cut off" and was "basically warned not to put in anymore sick calls or grievances[.]" (*Id.*) Holliday contends that Defendant Wloczewski told him to "quit creating a hard time for [the] medical staff or there [would] be consequences[.]" (*Id.* at 33.) Holliday claims that Wloczewski told him they could "make [his] life hell, and . . . arrange to have [Holliday] put in with an "inmate known throughout the jail for raping his" cellmates. (*Id.*) Shortly thereafter, Holliday claims he was "brought to talk with [Defendant] Pelaez who [also] made a comment about the consequences" if Holliday continued

---

[3]  Elsewhere in the Amended Complaint, Holliday asserts that he specifically informed Defendant Pelaez that he "required the use of catheters" as a result of a "bladder problem" which makes it difficult for Holliday to urinate at times. (ECF No. 16 at 12.)

to put in additional sick calls or grievances, specifically telling Holliday that if he "did so . . . [Holliday] could be moved to a cell with an aggressive inmate."  (*Id.* at 12.)

Following these conversations with Defendants Wloczewski and Pelaez, Holliday asserts that he made "multiple complaints about a swollen ankle" and was eventually taken down to medical where he saw Defendant Pelaez on or about September 4, 2019.  (*Id.*)  Holliday claims that upon his arrival, Pelaez asked him, "What did Dr. Wloczewski tell you Holliday?" – presumably a reference to the prior conversation wherein Wloczewski warned Holliday not to make additional sick calls or grievances.  (*Id.*)  As alleged, Pelaez went on to ask Holliday which foot was the problem, and upon Holliday pointing to his right foot, Defendant Pelaez "stepped [down] hard on" his right foot.  (*Id.* at 14.)  Holliday claims that he cried out in pain and before he could leave, Pelaez called Defendant Wloczewski who then "entered the exam area and warned [Holliday] not to tell anyone[.]"  (*Id.* at 14, 35.)  Holliday further claims that Defendant Wloczewski "made a point" of telling Holliday that he "would not be believed" and that his "life could be made more difficult."  (*Id.* at 14.)  Holliday alleges that after Pelaez stepped on his foot, Pelaez told him he could have a bottom bunk, which Holliday claims was his "reward for not causing trouble[.]"  (*Id.* at 14, 35.)  However, Holliday asserts that he still has trouble with his right foot and it has never been x-rayed.  (*Id.* at 35.)

### D.    Improper Doses of Methadone and Failure to Treat Complications

In addition to his need for medication for tachycardia, Holliday also alleges that he is on a methadone detox regimen.  (*Id.* at 14.)  Holliday asserts that he reported to medical on September 23, 2019 to receive his 16 mg dose of methadone, which Defendant Nurse Leona gave to him and he took.  (*Id.*)  Once he returned to his cell, Holliday claims that his cellmate informed him that "the nurse screwed up and gave you my dose" of methadone.  (*Id.*)  Holliday

further claims that he was subsequently "called back down to medical" and told that he was "given 100 mgs of methadone[.]"  (*Id.* at 16.)  Shortly thereafter, Holliday alleges that he became lethargic and was ultimately put in the medical housing unit in an observation cell for a period of 24 hours.  (*Id.*)  During that period, Holliday asserts that he began to shake uncontrollably, suffered from convulsions, "felt a cold spot in [his] head[,]" and became unconscious for an unknown amount of time.  (*Id.*)  Upon regaining consciousness, Holliday noticed foam around his mouth and alleges that he felt "different."  (*Id.*)  Holliday claims that upon regaining consciousness, he "immediately notified [Defendant] Officer Katkowski" of his condition and his apparent need to be seen by a "doctor or a trained medical professional[.]"  (*Id.*)  Holliday alleges that Defendant Katkowski called him "a liar" and other vulgar names.[4]  (*Id.*)

Holliday asserts that the following day he was seen by Defendant Jesse Kirsh, a physician's assistant, where he tried to explain his symptoms which included difficulty speaking, feeling off balance, and problems with his left arm.  (*Id.* at 16, 18.)  According to Holliday, Defendant Kirsh just "laughed it off" and told Holliday "You'll live[.]"  (*Id.* at 16.)  Holliday further asserts that he has "continued to experience speech problems, an awkward gait, and weakness in [his] left arm."  (*Id.* at 18, 21.)  Holliday claims that he has "put in several sick calls, requests, . . . grievances[,]" and appeals relating to these symptoms and the dosage mix-up, but that Defendants "do nothing to try to find out what damage [Holliday] may have suffered as a

---

[4]  In a grievance form attached to his Amended Complaint, Holliday asserted that he complained of his symptoms after the September 23, 2019 methadone dosage mix up, but that he was not believed and was left "stuck in the observation cell without receiving any medical attention aside from having [his] vital signs . . . checked" when he should have received an MRI or a CAT scan.  (*Id.* at 42.)

result" including possible seizures, convulsions, and/or a stroke. (*Id.*; *see also Id.* at 21) ("I still have not been properly treated for the effects from the [dosage] . . . mix up.")

Holliday claims that the September 23, 2019 dosage mix-up with his methadone was the first of two such instances. According to the Amended Complaint, on or about November 6, 2019, he was again called down to medical where he should have received just a 2 mg dose of methadone. (*Id.* at 21.) Holliday claims that his normal 2 mg dose does not have much of a taste, but the dose he received on November 6, 2019 had a very strong taste. (*Id.*) Holliday further alleges that about "half an hour later [he] began . . . feeling a bit lethargic and [he] started to nod and drool on [his] shirt." (*Id.*) Based on his previous experience in September, Holliday immediately reported how he was feeling, and he was later sent down to medical, where he asserts that he learned Defendant Nurse Leona had again given him the incorrect dose of methadone – a dose intended for another inmate.[5]  (*Id.* at 21-22.)  Holliday claims that he sent in a grievance related to this second mix-up but has "yet to be seen by the provider for a follow-up." (*Id.* at 21-22.)

### E. Failure to Consistently Receive Gluten Free Meals

According to the Amended Complaint, Defendant Pelaez "prescribed a medically necessary gluten free diet" for Holliday at some time during his incarceration. (*Id.* at 20.) However, Holliday claims that on September 12, 2019, his "diet tray" included "cream of wheat[.]" (*Id.*) Holliday asserts that he alerted Defendant Corrections Officer Almquist and questioned whether cream of wheat is supposed to be considered gluten free, to which Almquist responded by calling the kitchen to confirm Holliday was on a gluten free diet, and speculating

---

[5]  Holliday does not quantify the dose he received during the November 6, 2019 dosage mix-up but notes the name of the inmate whose dose he received instead of his own. (*Id.* at 21.)

"maybe it's gluten free cream of wheat." (*Id.*)  Beyond this specific incident, Holliday alleges that on a regular basis, the kitchen staff includes "white bread, pasta and other non-gluten free diet foods on [his] tray labeling it as 'gluten free'." (*Id.*)  He further asserts that when he complains about such instances, "staff refuses to call the kitchen to get [his] gluten free tray[.]" (*Id.*)  Holliday claims that he has "eaten things [he] believed to be gluten free only to find out later that [these foods] were not" and that he has gotten ill at times as a result.  (*Id.*)  Holliday speculates in the Amended Complaint whether the BCJ maintains a "true gluten free menu" and whether the inmate working in the kitchen handling diet meals is being "properly supervised[.]" (*Id.*)  Holliday further alleges that Defendant Sergeant Tassone in the kitchen "is well aware of this" situation.  (*Id.*)

## II.    STANDARD OF REVIEW

As noted above, the Court previously granted Holliday leave to proceed *in forma pauperis* based on his apparent inability to pay the fees to commence this action.[6]  (*See* ECF Nos. 14, 15.)  As Holliday is proceeding *in forma pauperis*, his Amended Complaint is subject to screening pursuant to 28 U.S.C. § 1915(e)(2)(B), which requires the Court to dismiss the Amended Complaint if, among other things, it fails to state a claim.[7]  Whether the Amended Complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard

---

[6]  As Holliday filed this case while incarcerated, he is obligated to pay the $350 filing fee in installments in accordance with the Prison Litigation Reform Act.  *See* 28 U.S.C. § 1915(b).

[7]  The Amended Complaint, once submitted to the Court, serves as the governing pleading in the case because an amended pleading supersedes the prior pleading.  *See Shahid v. Borough of Darby*, 666 F. App'x 221, 223 n.2 (3d Cir. 2016) (per curiam) ("Shahid's amended complaint, however, superseded his initial complaint." (citing *W. Run Student Hous. Assocs. LLC v. Huntingdon Nat'l Bank*, 712 F.3d 165, 171 (3d Cir. 2013)); *see also Garrett v. Wexford Health*, 938 F.3d 69, 82 (3d Cir. 2019) ("In general, an amended pleading supersedes the original pleading and renders the original pleading a nullity.  Thus, the most recently filed amended complaint becomes the operative pleading.") (internal citations omitted).

applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the Amended Complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). Conclusory allegations do not suffice. *Id.* As Holliday is proceeding *pro se*, the Court construes his allegations liberally. *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011). However, "liberal construction of a *pro se* amended complaint does not mean accumulating allegations from superseded pleadings." *Argentina v. Gillette*, 778 F. App'x 173, 175 n.3 (3d Cir. 2019).

## III.   DISCUSSION

In the Amended Complaint, Holliday seeks to bring claims for violations of his civil rights pursuant to 42 U.S.C. § 1983, the vehicle by which federal constitutional claims may be brought in federal court. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Importantly, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs." *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Indeed, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

### A.   Deliberate Indifference Claims Regarding Tachycardia Medication

Holliday's Amended Complaint primarily raises constitutional claims based on alleged deliberate indifference to a variety of medical needs. The Due Process Clause of the Fourteenth

Amendment governs claims brought by pretrial detainees.[8]  *Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005).  To establish a basis for a Fourteenth Amendment violation, a prisoner must allege that his conditions of confinement amount to punishment.  *Bell v. Wolfish*, 441 U.S. 520, 538 (1979).  "Unconstitutional punishment typically includes both objective and subjective components." *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007).  "[T]he objective component requires an inquiry into whether the deprivation was sufficiently serious and the subjective component asks whether the officials acted with a sufficiently culpable state of mind."  *Id.* (internal quotations and alterations omitted).

In that regard, "a 'particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose.'"  *Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012) (quoting *Stevenson*, 495 F.3d at 68); *Steele v. Cicchi*, 855 F.3d 494, 504 (3d Cir. 2017). Courts should consider the totality of the circumstances in evaluating such a claim.  *Bistrian*, 696 F.3d at 373 ("In evaluating a pretrial detainee's claim of unconstitutional punishment, courts must examine the totality of the circumstances within the institution.").  Furthermore, "[i]n determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion,"

---

[8]  Holliday's Amended Complaint indicates that at the time he submitted it for filing, Holliday was a pretrial detainee.  (*Id.* at 7.)  A review of public records further demonstrates that Holliday was arrested on June 21, 2019 in Reading, Pennsylvania and charged with retail theft and receiving stolen property.  *See Commonwealth v. Holliday*, CP-06-CR-0002924-2019 (C.P. Berks) at 1-2.   Holliday entered a guilty plea and was sentenced in that matter on November 18, 2019, just days after he submitted the Amended Complaint.  (*Id.* at 3, 6.)  However, all of the events alleged in the Amended Complaint occurred during the time that Holliday was a pretrial detainee.

11

courts are obligated to keep in mind that "such considerations are peculiarly within the province and professional expertise of corrections officials . . . ." *Stevenson*, 495 F.3d at 68 n.3.

To state a claim based on the failure to provide medical treatment, a detainee must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994); *Hope v. Warden York Cnty. Prison*, No. 20-1784, 2020 WL 5001785, at *12 (3d Cir. Aug. 25, 2020). "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted). To establish a plausible deliberate indifference claim, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and then disregarded that risk." *Farmer*, 511 U.S. at 834. Deliberate indifference has been found "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Allegations of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).

In the Amended Complaint, Holliday alleges that he was previously diagnosed with, and treated for, tachycardia,[9] by his personal physician in Reading, Pennsylvania. (ECF No. 16 at

---

[9] "Tachycardia is a faster than normal heart rate. A healthy adult heart normally beats 60 to 100 times a minute when a person is at rest. If [a person has] tachycardia . . ., the rate in the upper chambers or lower chambers of the heart, or both, are increased significantly." *Raisley v. Astrue*,

10.)  Holliday specifically asserts that he was prescribed the medication, metoprolol, by his personal physician and treated for his condition prior to his incarceration at BCJ.  (*Id.*)  Holliday also makes clear that he repeatedly informed prison officials of his need to obtain this medication for his heart condition, both at the time of his admission to BCJ and throughout his incarceration via requests for sick call and in person conversations with Defendants Wloczewski[10] and Pelaez.  (*Id.*)  However, despite signing a release of records from his personal physician, Holliday alleges that he did not receive his medication and his requests for medical care on this issue were ignored.[11]  (*Id.*)

Holliday also alleges that medical personnel at BCJ including Defendants Wloczewski and Pelaez threatened him, and that Defendant Pelaez purposely stepped on Holliday's injured foot, in order to stop Holliday from continuing to submit sick calls and grievances regarding his need for medical treatment, including obtaining metoprolol for tachycardia.  (*Id.* at 12, 33; *see also id.* at 31 (alleging that "the jail . . . continues to deny me this Medication and my heart is in pain and I have constant anxiety and [a] rapid heart rate as a result.")  Taken together and construing the Amended Complaint liberally at this early stage of the litigation, the facts alleged by Holliday are sufficient to state a plausible claim for deliberate indifference regarding

Civ. A. No. 12-606, 2013 WL 440971, at *7 (W.D. Pa. Feb. 5, 2013) (citing Mayo Clinic, Tachycardia, available at http://www.mayoclinic.com/health/tachycardia/DS00929.).

[10]  According to the Amended Complaint, at one point where Holliday was attempting to explain his tachycardia condition, Defendant Wloczewski referred to Holliday as the "tachycardia guy[.]"  (ECF No. 16 at 33.)

[11]  The Amended Complaint alleges that Holliday consistently did not receive metoprolol for his tachycardia.  (*See, e.g.*, ECF No. 16 at 31) ("To this day I have still not gotten my Tachycardia Medication.")  However, elsewhere in the Amended Complaint Holliday acknowledges "[t]his Jail at one time gave me Lopressor for the [tachycardia] condition."  (*Id.*)  It thus appears that while he may have at one time received medication for tachycardia, at some point he stopped receiving the medication.

Holliday's need to receive a previously prescribed medication for a diagnosed heart condition. As alleged, Holliday repeatedly informed Defendants about his need for this medication and these Defendants prevented him from receiving this prescribed medication.  Accordingly, Holliday will be permitted to proceed on this claim against Defendants Wloczewski and Pelaez.

> **B.**     **Deliberate Indifference Claims Regarding Catheters**

Holliday also seeks to bring a deliberate indifference claim based on the failure to provide medical treatment with respect to his inability to obtain prescribed catheters to aid him in urinating, particularly when he is required to provide a sample for urinalysis testing.  Like his claims regarding his tachycardia medication, Holliday similarly alleges that his personal physician previously diagnosed Holliday as having a "bladder condition" and that his physician prescribed the use of "French 14" catheters for occasions when Holliday is unable to urinate as necessary.  (ECF No. 16 at 10.)  Holliday again specifically asserts his personal physician treated him for his bladder condition and prescribed the use of catheters prior to his incarceration at BCJ.  (*Id.*)  The Amended Complaint also alleges that Holliday informed prison officials of his diagnosed bladder condition and his need for catheters at the time of his admission to BCJ and throughout his incarceration via requests for sick call and in person conversations with Defendants Wloczewski and Pelaez. (*Id.* at 10, 12.)  However, Holliday alleges that he was "never supplied any catheters" during his incarceration at BCJ and that his requests for medical care on this issue and his grievances were ignored.  (*Id.*)

Construed liberally, the Amended Complaint alleges sufficient facts at this screening stage of the litigation to state a plausible claim for deliberate indifference regarding Holliday's need for prescribed catheters when he had difficulty urinating due to a diagnosed bladder condition.  The Amended Complaint asserts that  Holliday repeatedly informed Defendants about

14

his need for catheters and his bladder condition, but that he was ignored.  It is also significant
that Holliday's Amended Complaint contains allegations that Defendants Wloczewski and
Pelaez threatened, intimidated, and retaliated against Holliday as a result of his multiple sick call
requests.   Accordingly, Holliday will be permitted to proceed on this claim.  *See Fleming v.
Allen*, Civ A. No. 07-2338, 2009 WL 2215956, at *1, *3-*4 (N.D. Cal. July 23, 2009)
(concluding at screening that pro se prisoner's amended complaint, read liberally, stated "a
cognizable claim for deliberate indifference to his serious medical needs against" a prison nurse
who failed to supply him with his required weekly catheters).

### C.  Claims concerning Disciplinary Housing

Holliday also names Sergeant Acker, the Head of the Disciplinary Housing Unit and
Hearing Examiner, as a Defendant.  Although it is a bit unclear, the Court understands the
Amended Complaint as seeking to raise a Due Process claim regarding Acker's decision to
impose a 15-day disciplinary punishment as a result of Holliday's failure to provide a urine
sample.  (ECF No. 16 at 10, 33.)  Holliday alleges that he was found "guilty" for failure to
provide a urine specimen, but that in imposing this discipline, Acker disregarded Holliday's
assertions that he had a bladder condition which required the use of catheters, particular for "on
the spot" urine samples, which he did not receive such that he was unable to comply.  (*Id.*)
Holliday also alleges that his discipline included being put into a cell where he was subjected to
other inmates urinating down into his cell from up above, and that Acker told him that was part
of the "experience."  (*Id.* at 10.)

"[I]nmates are generally not entitled to procedural due process in prison disciplinary
hearings because the sanctions resulting from those hearings do not usually affect a protected
liberty interest."  *Burns v. PA Dep't of Corr.*, 642 F.3d 163, 171 (3d Cir. 2011) (citing *Sandin v.*

*Conner*, 515 U.S. 472, 483-84 (1995)).  The sanctions imposed upon Holliday were insufficient to trigger due process protections.  *See Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002) ("[C]onfinement in administrative or punitive segregation will rarely be sufficient, without more, to establish the kind of 'atypical' deprivation of prison life necessary to implicate a liberty interest [for purpose of triggering due process protection]." (quoting *Sandin*, 515 U.S. 472 (1995))); *Griffin v. Vaughn*, 112 F.3d 703, 708 (3d Cir. 1997) (holding that "exposure to the conditions of administrative custody for periods as long as 15 months falls within the expected parameters of the sentence imposed [. . .] by a court of law" and does not constitute a due process violation (quotation omitted)).  However, to the extent the Amended Complaint may be construed to allege a conditions of confinement claim based on Holliday's allegations regarding the urine coming down from upper cells, the Court will not dismiss the claim at this time, as it is not clear the extent to which the cell, in which Holliday was housed for 15 days, was so unsanitary as to violate the prohibition against cruel and unusual punishment.  *See Taylor v. Riojas*, 141 S. Ct. 52 (2020).  Accordingly, Holliday's due process claim against Sergeant Acker will be dismissed, but not the claim based on the conditions of confinement.

     **D.**     **Retaliation Claims for Seeking Medical Care and Filing Grievances**

     Holliday's Amended Complaint also appears to be raising retaliation claims against Defendants Wloczewski and Pelaez.  In order to state a plausible First Amendment retaliation claim, a prisoner must allege that: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action.  *See Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).  A prisoner's filing of a grievance

constitutes constitutionally protected conduct.  *See Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir.

2016).  The timing of the allegedly retaliatory behavior relative to the constitutionally protected

conduct may establish a causal link between the two for purposes of establishing motivation.  *See*

*id*.

The allegations of the Amended Complaint, construed liberally, set forth a plausible

claim for retaliation against Defendants Wloczewski and Pelaez.  Holliday alleges that these

Defendants were aware of not only his multiple sick calls seeking medical treatment but also the

grievances Holliday filed regarding his medical care, or lack thereof, at BCJ.  (ECF No. 16 at

12.)  Holliday specifically alleges that Defendant Wloczewski "basically warned [Holliday] not

to put in anymore sick calls or grievances[,]" and that Defendant Pelaez subsequently reiterated

this message to Holliday as well.  (*Id.*)  Holliday claims that both Defendants made comments

about Holliday facing "consequences" if he continued filing sick calls and grievances –

consequences that apparently included potentially being housed with an aggressive cellmate.  (*Id.*

at 12, 14, 33.)

Further, Holliday alleges that when he sought subsequent medical care for a swollen

ankle, Defendant Pelaez "stepped [down] hard on" his injured right foot in an apparent act of

retaliation, causing Holliday to cry out in pain.  (*Id.* at 14.)  Holliday claims that shortly

thereafter, Wloczewski arrived and continued their attempts to threaten and intimidate Holliday

from filing additional grievances by telling him he would not be believed and providing him a

bottom bunk pass as a "reward" for his cooperation.  (*Id.*)  The denial of medical treatment when

it was sought, coupled with the infliction of physical pain to the initial injury, and the use of

threats and "rewards" to intimidate and prevent Holliday from speaking out about these events,

clearly represent an "adverse action" and demonstrate a sufficient causal link between the

exercise of Holliday's constitutional rights and the actions taken against him.  Liberally construed and accepted as true at this stage of the litigation, Holliday's allegations set forth a plausible claim for retaliation and that claim will be permitted to proceed.[12]

### E.    Deliberate Indifference Claims Arising from Methadone Dosage Mix-Ups

In the Amended Complaint, Holliday alleges that on two separate instances, once in September and once in November of 2019, Defendant Nurse Leona gave him an incorrect dose of methadone.  (ECF No. 16 at 14, 16, 21-22.)  Although he was placed in the medical housing unit for a 24 hour observation period after the first dosage mix-up, Holliday alleges that he lost consciousness, suffered seizures, convulsions, and a possible stroke as a result of this mix-up and that he has ongoing symptoms, including speech problems, an awkward gait, feeling off balance, and problems with his left arm.  (*Id.* at 16, 18, 21.)  Holliday further alleges that he has reported these ongoing symptoms both in person to Defendant Kirsh, and by way of  sick calls, grievances, and appeals, but he has not received any further treatment or evaluation for these ongoing symptoms such as an MRI or a CAT scan.  (*Id.* at 16, 21.)  Specifically, Holliday alleges that Defendant Kirsh just "laughed it off" and told him "You'll live[.]"  (*Id.* at 16.)

Much like Holliday's other deliberate indifference claims regarding his medical treatment at BCJ, the Amended Complaint, construed liberally, sets forth a plausible claim that Defendants Kirsh, Wloczewski, and Pelaez were deliberately indifferent to his serious medical needs

---

[12]  The Amended Complaint also sufficiently alleges a plausible claim for excessive force based on his allegation that Pelaez deliberately inflicted pain upon Holliday by stepping on his injured foot and for deliberate indifference to his serious medical needs based on allegations that Holliday still has trouble with his right foot and has not received medical treatment for the initial injury or the additional injury caused by Defendant Pelaez stepping on his foot.  (ECF No. 16 at 35.)  Accordingly, Holliday will also be permitted to proceed on these claims.

following his receipt of incorrect doses of methadone.[13]  While it appears Holliday was initially observed in the medical unit following the methadone dosing error, he alleges that he had ongoing problems after that time including difficulty speaking, an awkward gait, and weakness in his left arm that were not addressed by the medical providers despite the persistence of these symptoms.  Holliday makes clear that he informed Defendant Kirsh of his concerns, but his medical issues were "laughed off", and that his sick calls and grievances on the issue also failed to bring about additional medical treatment.  Accordingly, Holliday's deliberate indifference claims regarding failure to receive medical treatment for these ongoing symptoms related to his methadone dosing errors will be permitted to proceed.

### F.    Deliberate Indifference Claims Relating to Gluten Free Diet

The Eighth Amendment requires that inmates be served "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it."  *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir.

---

[13]  However, the Amended Complaint does not set forth a plausible claim for deliberate indifference against Defendant Nurse Leona.  The Amended Complaint alleges only that Defendant Leona "is totally mistake prone" and has "made several errors dispensing methadone"  (ECF No. 16 at 16, 37.) As set forth in the Amended Complaint, Holliday has only alleged, at best, that Defendant Leona acted negligently in mistakenly giving him the wrong doses of methadone.  Accordingly, any claims against Defendant Leona will be dismissed since Holliday's allegations are insufficient to establish a constitutional violation.  *See Spruill*, 372 F.3d at 235.

Additionally, to the extent Holliday seeks to bring this claim against Defendant Katkowski based on vulgar language and names he called Holliday after the methadone dosage incident, these allegations are insufficient to state a plausible claim against Katkowski based on those comments, and those the claims against Defendant Kirsh will be dismissed.  *See, e.g., Ledcke v. Pennsylvania Dep't of Corr.*, 655 F. App'x 886, 888–89 (3d Cir. 2016) (per curiam) (detainee's "claims of verbal harassment fail[ed] as a matter of law"); *Lindsey v. O'Connor*, 327 F. App'x 319, 321 (3d Cir. 2009) (per curiam) ("Verbal harassment of a prisoner, although distasteful, does not violate the Eighth Amendment; *see also  McBride v. Deer*, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001) ("[A]cts or omissions resulting in an inmate being subjected to nothing more than threats and verbal taunts do not violate the Eighth Amendment").

1980).  To state a claim, a plaintiff must allege deliberate indifference on the part of defendants by alleging facts which show that they had knowledge of his serious need for a medically prescribed diet and that they intentionally refused to provide him with this diet, delayed access to the diet for a non-medical reason or otherwise prevented him from receiving the diet. *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

Here, Holliday explicitly alleges that he was prescribed a medically necessary gluten free diet by Defendant Pelaez, and that on a regular basis, the kitchen staff at BCJ included white bread, pasta, cream of wheat, oatmeal, and other foods that were not gluten free on his diet tray, "labeling it" as gluten free.  (ECF No. 16 at 20.)  Holliday further asserts that he has eaten these foods believing they were gluten free, only to subsequently find out they were not when he became ill from eating those items.  (*Id.*)  Holliday also alleges that when he complained about this issue, staff "refuse[d] to call the kitchen to get [his] gluten free tray."  (*Id.*)  According to the Amended Complaint, Defendant Sergeant Tassone, the kitchen supervisor, was aware of Holliday's need for a gluten free diet and that fact that he regularly received foods that were not gluten free.  (*Id.*)  Holliday also asserts that Defendant Tassone supervises the inmates who prepare special diet trays in the kitchen, and he has "been known to punish inmates that receive special diets for medical needs, by giving them food loaf" which Holliday receives on his tray and is told it is a rice cake.  (*Id.* at 33.)  Construed liberally, these allegations, although limited, are sufficient to state a plausible claim for deliberate indifference to Holliday's need to receive his prescribed gluten free diet, and this claim will be permitted to proceed against Defendant Tassone.[14]  *See Phillips v. Superintendent Chester SCI*, 739 Fed. App'x 125, 128-29 (3d Cir.

---

[14]  Holliday also names Corrections Officer Almquist with respect to his claim related to his gluten free diet.  However, the allegations of the Amended Complaint reflect only a one-time brief exchange between Holliday and Almquist regarding whether or not Cream of Wheat is gluten free.  (ECF No. 16 at 20.)  The Amended Complaint alleges that Almquist called the kitchen staff to confirm

2018) (reversing the district court's dismissal of prisoner's Eighth Amendment claim against prison kitchen supervisor and others related to prison's failure to ensure prisoner received meals that complied with the requirements of his medically prescribed meal regimen to exclude onions, peppers, and soy-based products).

### G.    Claims Against the Berks County Jail System and Berks County Probation and Parole

Holliday names the Berks County Jail System as a Defendant in his Amended Complaint. However, BCJ is not considered a "person" for purposes of § 1983. *See Edwards v. Northampton Cty.*, 663 F. App'x 132, 136 (3d Cir. 2016) (explaining that the district court "appropriately disposed of" prisoner's conditions of confinement claims against Northampton County Prison on the basis that a prison is not a "person" subject to suit under § 1983) (citing *Fischer v. Cahill*, 474 F.2d 991, 992 (3d Cir. 1973)); *see also Lenhart v. Pennsylvania*, 528 F. App'x 111, 114 (3d Cir. 2013) ("Westmoreland County Prison is not a person capable of being sued within the meaning of § 1983."); *see also White v. Knight*, 710 F. App'x 260, 262 (7th Cir. 2018).  Accordingly, any claim alleged against BCJ itself will be dismissed with prejudice for failure to state a claim pursuant to § 1915(e)(2)(B)(ii).

Similarly, Holliday also names Berks County Probation and Parole as a Defendant in this matter, however any claims against Berks County Probation and Parole are barred by the Eleventh Amendment.  The Third Circuit has repeatedly held that "Pennsylvania's judicial districts, including their probation and parole departments, are entitled to Eleventh Amendment immunity." *Haybarger v. Lawrence Cty. Adult Prob. & Parole*, 551 F.3d 193, 197 (3d Cir. 2008) (citing *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 241 (3d Cir. 2005)).  As

---

Holliday's need for a gluten free diet tray, (*id.*), and these allegations are insufficient to support a deliberate indifference claim against Defendant Almquist.  Accordingly, Holliday's claims against Almquist will be dismissed without prejudice.

Pennsylvania has not waived its sovereign immunity, and because Congress has not explicitly abrogated immunity through authorizing legislation, the Eleventh Amendment operates as a bar to claims for damages under § 1983 against Berks County Probation and Parole.  Moreover, Berks County Probation and Parole is not a "person" subject to suit under § 1983.  *See Beaver v. Del. Ct. Prob. and Parole*, Civ. A. No. 15-2784, 2016 WL 4366977, at *3 n.5 (E.D. Pa. Aug. 16, 2016).  Accordingly, all claims against Berks County Probation and Parole will also be dismissed with prejudice.

### H.    Claims Against the Warden and Deputy Warden

Holliday names Warden Janine Quigley and Deputy Warden Smith as Defendants in this action.  In the Amended Complaint, Holliday asserts that these Defendants knew about the allegations asserted in his Amended Complaint based on their involvement with, or receipt of, the many grievances Holliday has filed, but that these Defendants failed to act with respect to his various issues and need for medical treatment.  (*See, e.g.*, ECF No. 16 at 31) (explaining that Defendant Quigley "was directly notified of my need for Tachycardia [medication] through the inmate grievance and appeal process, and has failed to act.").

However, "[m]erely responding to or reviewing an inmate grievance does not rise to the level of personal involvement necessary to allege an Eighth Amendment deliberate indifference claim." *Tenon v. Dreibelbis*, 606 F. App'x 681, 688 (3d Cir. 2015) (per curiam); *Curtis v. Wetzel*, 763 F. App'x 259, 263 (3d Cir. 2019) (per curiam) ("The District Court properly determined that Defendants Wenerowicz, Lewis, and Shaylor – who participated only in the denial of Curtis' grievances – lacked the requisite personal involvement [in the conduct at issue]." ); *Folk v. Prime Care Med.*, 741 F. App'x 47, 51 (3d Cir. 2018) (per curiam) ("Although some of these defendants were apparently involved in responding to some of Folk's prison

grievances, there are no allegations linking them to the underlying incidents and thus no basis for liability based on those later grievance reviews.").  Moreover, "[i]f a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."  *See Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004); *see also Carter v. Smith*, 483 F. App'x 705, 708 (3d Cir. 2012) (per curiam) ("Prison officials cannot be held to be deliberately indifferent merely because they did not respond to the medical complaints of a prisoner who was already being treated by the prison medical staff.").

As alleged in the Amended Complaint, Holliday's claims against Warden Quigley and Deputy Warden Smith relate solely to their involvement in the grievance process and their alleged failure to act after learning about Holliday's complaints through that process.  The Amended Complaint is devoid of any allegations that these Defendants, who are not medical personnel, had any personal involvement in the underlying conduct of which Holliday complains. [15]  Accordingly, he has not stated a plausible constitutional claim against either Warden Quigley or Deputy Warden Smith and his claims against them will be dismissed.

## I.    Claims Against PrimeCare Medical

Holliday's Amended Complaint also names PrimeCare Medical as a Defendant.  He alleges only that PrimeCare is a "company that contracts medical staff out to institutions" and "is known to encourage the very minimum of treatment necessary to save costs[.]"  (ECF No. 16 at 31.)  According to Holliday, this "creates a Medical Staffing environment where Doctors and Nurses are encouraged to ignore medical issues and provide subpar treatment."  (*Id.*)  To the

---

[15] Furthermore, "[p]rison inmates do not have a constitutionally protected right to a grievance process."  *See Jackson v. Gordon*, 145 F. App'x 774, 777 (3d Cir. 2005) (per curiam); *see also Caldwell v. Beard*, 324 F. App'x 186, 189 (3d Cir. 2009) (per curiam).  Accordingly, Holliday cannot state a constitutional claim based solely on the Warden's (or the Deputy Warden's) participation in the grievance process.

extent Holliday seeks to bring a deliberate indifference to serious medical claims against
PrimeCare Medical, the Amended Complaint fails to state a plausible claim against PrimeCare
Medical.

A private corporation under contract to provide prison health services may be liable
under § 1983 only if that entity's policies or customs caused the alleged constitutional violation.
*See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978); *Natale v. Camden Cnty.*
*Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003).  The plaintiff "must identify [the] custom or
policy, and specify what exactly that custom or policy was" to satisfy the pleading standard.
*McTernan v. City of York,* 564 F.3d 636, 658 (3d Cir. 2009).  Even construed liberally, the
Amended Complaint does not state a plausible claim for relief against PrimeCare Medical
because Holliday makes only conclusory allegations that PrimeCare Medical is seeking to save
costs and thereby minimize treatment which encourages medical personnel employed by
PrimeCare to ignore medical issues and not provide treatment.  *Cf. Yoast v. Pottstown Borough*,
437 F. Supp. 3d 403, 441 (E.D. Pa. 2020) (discrediting "conclusory" allegation that PrimeCare
lacked a policy to address inmates' serious medical conditions).  Holliday does not allege any
substantive facts describing any actual policy, custom, or practice PrimeCare maintains that
would have resulted in the constitutional violations he asserts regarding his medical care.  *See*
*Shaner v. PrimeCare Med. Inc.*, Civ. A. No. 19-2442, 2020 WL 1164799, at *4 (E.D. Pa. Mar.
10, 2020) (concluding pro se prisoner failed to allege a plausible § 1983 claim of deliberate
indifference to serious medical needs against PrimeCare and granting PrimeCare's motion to
dismiss).  Accordingly, Holliday's claims against PrimeCare Medical will be dismissed without
prejudice.[16]

---

[16] To the extent Prime Care employees are sued in their official capacities, those claims are
essentially claims against Prime Care, so they fail for the same reasons.

**IV.     CONCLUSION**

For the foregoing reasons, the Court will dismiss the Amended Complaint in part pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim with the exception of the following claims which will be permitted to proceed: (1) Holliday's Eighth Amendment deliberate indifference claim regarding his tachycardia medication against Defendants Wloczewski and Pelaez; (2) Holliday's Eighth Amendment deliberate indifference claim regarding his need for catheters against Defendants Wloczewski and Pelaez; (3) Holliday's claim based upon the cell conditions against Sgt. Acker; (4) Holliday's Eighth Amendment deliberate indifference claim regarding his foot and ankle injury against Defendants Wloczewski and Pelaez; (5) Holliday's excessive force claim based on Pelaez's deliberately stepping on Holliday's injured foot and causing additional injury; (6) Holliday's Eighth Amendment deliberate indifference claim regarding ongoing symptoms after the methadone dosage mix-up against Defendants Kirsh, Wloczewski, and Pelaez; (7) Holliday's retaliation claims against Defendants Wloczewski and Pelaez; and (8) Holliday's Eighth Amendment deliberate indifference claim regarding his gluten free diet claims against Defendant Tassone.

An appropriate Order follows.

**BY THE COURT:**

**/s/ Cynthia M. Rufe**

_____

**CYNTHIA M. RUFE, J.**